West Mead Township *v.* Meadville.

Argued June 6, 1972, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Stuart A. Culbertson,* for appellant.

*Charles J. Swick,* City Solicitor, for appellee.

OPINION PER CURIAM, August 16, 1972:

The order of the Court of Common Pleas of Crawford County affirming the annexation of a portion of West Mead Township to the City of Meadville, as described in Meadville City Ordinance No. 2704 is hereby affirmed upon the opinion of President Judge P. RICHARD THOMAS. The pertinent portions of President Judge THOMAS's opinion follow:

This matter is before the court on appeal by the Supervisors of West Mead Township from the adoption of Annexation Ordinance No. 2704 by the City of Meadville on March 25, 1969. Proceedings were under the Act of July 20, 1953, P. L. 550 (53 P.S. 67501). Seven property owners were affected by the annexation, four of whom joined in the petition for annexation. The annexed area contains approximately twenty-four (24) acres. The four property owners signing the annexation petition own in excess of twenty (20) acres of the land; Golfview Manor, Inc., a multiple family apartment complex, owns about nineteen of these twenty acres. One dwelling house and one church are involved in the area, the owners of which joined in the petition for annexation. The remaining acreage consists of vacant building lots owned by petitioners and non-petitioners.

The annexed area is bounded on the north by a public road, on the east and south by the City of Meadville, and on the west by a public road across which lies land in the city. This area forms something of a "pocket" which was excluded from a former annexation proceed-

ing because the former owners had no desire at that time to come into the city.[1]

. . . .

Annexation problems between the City of Meadville and West Mead Township have generated considerable litigation and controversy in the recent decade. (See, *In Re: Annexation of Part of West Mead Township to City of Meadville (No. 1)* (220 acres—Terrace Street and Baldwin Street area), 3 Crawford Legal Journal 175, affirmed on appeal 411 Pa. 94, 191 A. 2d 273 (1963); *In Re: Annexation of Part of West Mead Township to City of Meadville (No. 4)* (Ray Horton American Legion Post), 3 Crawford Legal Journal 186 (1963) (dismissed on technical grounds); *In Re: Annexation of a Part of West Mead Township to City of Meadville (No. 2)* (450 acres—North Main Street area), 4 Crawford Legal Journal 164, affirmed on appeal 206 Pa. Superior Ct. 166, 213 A. 2d 124 (1965).)

The posture of the two municipalities is the familiar one of the city claiming more land is needed for expansion and the township pleading that piecemeal annexation erodes the tax base and precludes future planning for supplying services. The posture of the land owner in the annexed areas usually varies, depending on emotionalism, future tax and service charge projections, or the present condition of the individual's water well and septic tank.

We need not here recite a lengthy decisional history of the criteria the court should use in approving or disapproving annexation. The polestar guiding the court must be whether the proposed annexation serves the general public interest and this includes many considerations. *Conewago Township Annexation*, 7 Adams L. J. 139 (1966). The court must consider not only the

---

[1] See *In Re: Annexation of a Part of West Mead Township to City of Meadville (No. 2)*, affirmed 206 Pa. Super. 166, 213 A. 2d 124 (1965).

municipalities involved but also the interest of the owners of the property in the area proposed to be annexed. *Lancaster Annexation Case,* 183 Pa. Superior Ct. 618, 132 A. 2d 743 (1957). However it seems obvious that the wishes of the majority of the freeholders in the area is only one of many factors involved because, obviously, since a majority of the freeholders must be petitioners for annexation, the court approval would be mandatory if their wishes were controlling. *Chartiers Township Appeal,* 414 Pa. 176, 199 A. 2d 443 (1964). The reduction of assessed valuation and consequent loss of revenue to the township is present in every annexation proceeding and is an important but not controlling factor. *Barry Township Annexation Case,* 398 Pa. 180, 157 A. 2d 410 (1960) (assessed value of township reduced twenty-one percent—annexation approved).

The legislature never intended that township lines should remain intact. The intention of the legislature was that annexation should take place under the terms prescribed by it where the circumstances warrant annexation. Annexation is an intrinsic right and duty imposed upon municipal corporations by the very exigencies of social progress and governmental orderliness. *Lancaster Annexation Case (No. 1),* 374 Pa. 529, 98 A. 2d 25 (1953).

The focus of this annexation is the Golfview Manor complex consisting of several apartment and town house buildings and a clubhouse and swimming pool that will initially comprise 96 living units. Future plans call for more buildings with an additional 128 living units. The real estate, per capita and wage tax receipts from this complex could be a very desirable addition to the revenue structure of either municipality.

At the time of annexation the total assessed value of the whole twenty-four acre parcel was $9,500. This represents a real estate tax of $114 (at 12 mills—the then current West Mead rate). This assessment and

revenue loss is infinitesimal when compared to the total township assessment of $4,021,500. Future projections, however, present a different picture, as the county assessor estimates an eventual assessed valuation of the area at $189,400. This would represent about four and one-half percent (4½%) of the total assessed valuation of the township.

Loss or gain of projected future tax and general revenue income is generally not a reliable indicator of desirability. Obviously, the municipality gaining the added revenue takes upon itself the expense of providing additional services to the area.

In the normal development of a complex of the nature of Golfview, one would expect that annexation (to acquire needed water and sewer services) would precede construction. However, this did not occur in this instance, as the location of the Golfview development in city or township was largely dependent upon the outcome of some exploratory water and sewer negotiations between city and township officials. Obviously, the township, with no municipal water system and with the nearest available sewer line nearly a mile away, was in no position to supply these services. The city had both water and sewer lines adjacent to the land and able to service the area. Before the start of construction of the Golfview complex and in order to satisfy the mortgagee, Golfview apparently had to produce evidence that the apartment complex would have water and sewer services. Accordingly, on February 22, 1968, the solicitor for the township board of supervisors wrote the following letter to Golfview:

"February 22, 1968

"Golfview Manor, Inc.
"965 Water Street
"Meadville, Pennsylvania
"Gentlemen:

"As Solicitor for the Board of Supervisors of West Mead Township, Crawford County, Pennsylvania, I am

authorized to advise you that public water and sewage facilities are available and installed on the property situated at the corner of Gasteiger Road, Park Avenue Extension and Azalea Street, in Meadville.

"This area is also zoned for multiple family dwellings and the streets are sewered to the area where the project complex is contemplated.

> "Very truly yours,
> "(Stuart A. Culbertson)
> "Solicitor for the Board of Supervisors of West Mead Township, Crawford County, Pa."

Just how the township could give this assurance that water and sewer were available when the township had no such facilities to offer and no agreement was in existence with the City poses an interesting question. At oral argument in response to the court's inquiry on this point, the township solicitor advised that at the time the letter was written, negotiations were going on between the township and city officials endeavoring to reach a policy agreement regarding the furnishing of these services to township residents. It was further half-heartedly argued that no one had ever proved that West Mead could *not* supply sewer services to Golfview because in the testimony before the Commissioners and the court no one had directed this specific question to any of the supervisors.

We note the Commissioners found as a fact (Finding No. 15), "West Mead Township has a sewage system, but could not service this area. The Township has no water system." Whether the question was asked or not, it is an obvious fact that the township could not at the time of construction furnish sewer services to Golfview and our attention has not been directed to any plans to extend the recently installed partial township sewer system to this area.

The hoped for agreement between the city and township regarding the supplying of city water and sewer services never came to fruition. We need not explore the reasons therefor except to note that both parties, bargaining in good faith for the citizenry they represent, have been unable to mould a satisfactory agreement regarding the scale of rates or the added "tap in fees" and "plant investment charges" the city is to charge non-residents for providing these valuable services. It is not the court's prerogative to establish appropriate sewer and water fees or to determine the correctness of the city's position that the total charges for sewer and water services to non-residents should be higher than to residents in order to belatedly defray a portion of the capital investment costs in plant and lines the city residents have already paid for.

From the facts found by the Commissioners and from the hearing before the court, it is obvious that the sewer and water rates, including "tap in fees" and "plant investment fees", that the city will charge Golfview as a non-resident will be substantially higher than will be charged if they are a resident.[4]

It is axiomatic that sewer and water charges are an important element in a landlord's rent structure and are merely charges passed on to tenants through rental

[4] At the hearing the City Manager estimated the average sewer rate for residents of the city (based on 50% of the water charges) at about $17 per annum and at $31 if depreciation, maintenance, etc., are considered. The few township residents who have been permitted to tie into city sewer lines pay the city 90% of the township sewer rate of $82.80 per year. Thus, non-resident sewer rates are more than double city rates *exclusive* of any additional plant investment fees initially charged by the city to non-residents. No specific annual water rate figures were elicited. A proposal advanced at one stage of city-township negotiations provided for a $150 plant investment fee for sewage and a $230 plant investment fee for water *for each family unit* using the services in the Golfview complex.

charges. The laws of practical economics then dictate that unless there is a substantial and dramatic modification in the city's proposals for servicing non-residents, that sooner or later the tenants at Golfview will be paying higher rents if they remain non-residents of the city.

The Meadville area, including its surrounding townships are in dire need of rental housing at all economic levels and at the lowest possible rental rates. Developments of the Golfview type are to be encouraged, particularly developments for accommodation of lower income groups. Whether they be planned in the city or township, it is axiomatic that they must be serviced with municipal sewer and water facilities.

With city water and sewer lines adjacent to the annexed area and the township admittedly unable to provide these services, common sense dictates that the owners and the tenants will be economically benefited by annexation. "In determining the ultimate question of annexation, the court should consider not only the municipalities involved but also the interests of the owners of the property within the area annexed." *Lancaster Annexation Case*, 183 Pa. Superior Ct. 618, 132 A. 2d 743 (1957).

In addition to substantially lower sewer and water rates (translated into theoretical lower rents for the Golfview complex), the residents in the annexed area will also have the advantages of the following:

(a) A full time city police department compared to a one-man township police force.

(b) A full time nineteen man paid city fire department compared to a township volunteer department.

(c) Twice weekly garbage collection paid from general tax revenues compared with arranging to pay a private collector in the township.

(d) Mandated inspection services under the City Building and Housing Code, whereas the township has

no such code and only sewer inspections for those on the township sewer system.

We are not unmindful of the township cry that it will lose substantial revenue but we feel that this obvious loss cannot be totally considered "in futuro". *At the time of the annexation,* the tax loss to the township was minimal. The township's primary loss was in twenty acres of potentially valuable real estate. And here we get into the proverbial "which came first" riddle. Golfview would not even be a dream in the developer's eye without the attractive properly zoned real estate located in the township *and* the existing city sewer and water services running to its borders. Without each there could have been no development and no amount of argument can resolve which of the two essential ingredients is most important. Only one thing is certain—the community is a better community because of the attractive development of this acreage.

A majority of the citizens in the area proposed to be annexed have signified an intention to reside in the city. The City of Meadville has approved their request. It is not the province of the court to set aside the will of the petitioners and the city unless cogent reasons appear to convince the court that the annexation is against the public interest. See *Irwin Borough Annexation,* 171 Pa. Superior Ct. 256, 90 A. 2d 365 (1952).

We are convinced that on balance this area and its residents can be better serviced at the same or lower total tax and service rates by being joined to the city. We are not unmindful of the threat of piecemeal annexation and the cases frequently cited in alluding to this problem. See Judge CAMPBELL'S opinion in *Spring Township Annexation,* 60 Chrostwaite's Municipal Law Reporter 319 (1969). The oft-heard cry that piecemeal annexation destroys the township tax base, raises township taxes, destroys or retards effective planning cannot be taken lightly. As Judge DIGGINS pointed out in

*Annexation of a Portion of Chester Township,* 47 Del. Co. Reports 288—quoted with approval by the Pennsylvania Superior Court in *West Mead Township Annexation (No. 2),* Supra: ". . . It is the responsibility and duty of the court to stop it (sic: piecemeal annexation) at the point where the interests of the township exceed those of the people involved."

But we can find no such pattern emerging as a result of past annexations and the one here at issue involving West Mead Township and the City of Meadville. As hereafter noted, the tax millage in the township has not increased, no testimony was produced showing past or pending annexations have retarded township planning and the following township assessment pattern reflects a steady growth in assessed valuation except for the large amount of acreage lost in the 1965 annexation:

WEST MEAD TOWNSHIP REAL ESTATE ASSESSED VALUATION

| Year | Assessment | Change |
|------|-----------|--------|
| 1960 | $4,245,606 | |
| 1961 | 4,299,666 | + $ 54,060 |
| 1962 | 4,332,811 | + 33,145 |
| 1963 | 4,401,580 | + 68,769 |
| 1964 | 4,461,929 | + 60,349 |
| 1965 | 4,588,956 | + 127,027 |
| 1966 | 3,655,392 | — 933,564 |
| 1967 | 3,735,400 | + 80,008 |
| 1968 | 3,806,350 | + 70,950 |
| 1969 | 4,036,450 | + 230,100 |
| 1970 | 4,438,550 | + 402,100 |

The threat of piecemeal annexation township suicide also raised by West Mead Township in prior annexations (see West Mead Annexation cases cited supra) certainly has not come to pass in the years since the prior annexations took large blocks of acreage *and* tax

revenue from the township. In 1960 and 1961 the township tax millage was 11 mills; from 1962 to 1968, the millage was 10 mills; in 1969, 12 mills; and in 1970, 10 mills. Specifically, West Mead Township appears to have found it unnecessary to substantially increase taxes to replace revenues lost by prior annexations. The township debt appears also to be minimal—$33,350 against township cash funds of $35,300 as of July 29, 1969 (see Commissioners Finding No. 7).

We find, therefore, that West Mead will suffer no grievous harm by this annexation. The city is able to provide services the township cannot. The annexation will straighten the boundary lines between the municipalities in a rational geographical manner and affords the city the opportunity to expand its services into an area already surrounded by the city. The residents of the area will enjoy more and better municipal services than available in the township at lower rates. The area in question is an area that should have been included in prior annexations and allows an orderly extension of city boundaries to cover an area ideally suited for an extension of city services.